UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
UNITED STATES OF AMERICA,

                                      **OPINION AND ORDER**

        - v-                           95 CR 661 (RPP)

IVICA SARIC,
                             Defendant.
------------------------------------------------------------X

## I.    <u>Introduction</u>

On September 30, 2010, Defendant Ivica Saric moved to dismiss the present Indictment on two grounds: 1) that his right to a speedy trial pursuant to the Sixth Amendment and the Speedy Trial Act had been violated; and 2) that the Indictment fails to state a claim for which the Defendant can be prosecuted. Saric also moved to suppress all statements obtained by law enforcement officials before and after his arrest as violative of his rights against self-incrimination pursuant to <u>Miranda v. Arizona</u>, 384 U.S. 346 (1966). On October 20, 2010, this Court held a hearing on the issue of suppression. Supplemental briefing by the parties was submitted on November 24, 2010.  On December 28, 2010, this Court granted the Government's request to exclude time between December 28, 2010 and the date of this opinion under the Speedy Trial Act, 18 U.S.C. § 3161 (h)(7)(A).

For the reasons that follow, all three of Saric's motions are denied.

## II.    <u>Background</u>

Defendant Ivica Saric, a Canadian citizen, came to the United States in the early 1990's. (Def. Aff. ¶ 2). In 1993 and 1994, Saric was the sole owner and operator of Tip Top Travel, NY Inc. ("Tip Top"), a travel agency located at 27 West 20th Street, New York, New York. (Compl. ¶ 2, Def. Aff. ¶ 2). Saric was able to work in the United States under a B-1 visa. (Def. Aff. ¶ 2).

In 1993, Tip Top initiated an application with the Airlines Reporting Corporation ("ARC"), id. at ¶ 5, an independent corporation owned by sixteen airlines that has an affiliation with over 40,000 travel agencies throughout the United States. (Compl. ¶ 2). Approval of Tip Top's application with ARC enabled the agency to print airline tickets on ARC ticket stock using special plates with Tip Top's name and identification number such that the tickets would be accepted by major airlines. (Def. Aff. ¶ 5). Once a ticket is sold by an affiliate travel agency, ARC collects the ticket price from the agency and passes the money to the appropriate airline.

The application for ARC accreditation required extensive information from Saric, including a copy of his passport, name of previous employers, bank account information and tax filings from the five years prior to his ARC application. Id. ARC approved Tip Top's accreditation and assigned the agency a unique Agency Code Number ("ACN"). Id. at ¶ 6. In addition to assigning the ACN, ARC also commenced shipment to Tip Top of the blank ticket stock required to print airline tickets. Id. at ¶ 7.

During 1994, Tip Top began to fall behind on its payments to ARC. (Def. Aff. ¶ 8).  As of early September 1994, Tip Top allegedly owed ARC more than $47,000 for airline tickets that had been distributed to passengers and reported to ARC but had not been paid for by Tip Top. (Compl. ¶ 2.b).While Tip Top would occasionally fall behind on payments, it would, according to Saric, eventually make the necessary payments to ARC. (Def. Aff. ¶ 8). The complaint alleges that on or about September 9, 1994, an ARC representative went to the Tip Top office and demanded the return of its ARC ticket stock and airline identification plates. (Compl. ¶ 2.d). From that point forward, Tip Top was allegedly no longer authorized to issue any ARC airline tickets using its unique ACN. Id. According to Saric, however, ARC never notified him that Tip

Top was no longer authorized to issue airline tickets, nor did any ARC representative ever come to Tip Top premises and confiscate airline ticket stock. (Def. Aff. ¶ 9).

The complaint alleges that between on or about September 10, 1994 and on or about September 18, 1994, Tip Top issued approximately 195 unauthorized ARC airline tickets. (Compl. ¶ 2.e). These tickets contained Tip Top's ACN, which it was allegedly no longer authorized to use. Id. Tip Top did not report any of the allegedly unauthorized ticket sales to ARC or make any payments to ARC related to those ticket sales. Id. These tickets had a value of approximately $188,841.35. Id.

In 1994, Saric began seeking investors and/or buyers for Tip Top. (Def. Aff. ¶ 10). Through this process, Saric met Mark Edelstein, an investment consultant. Id. During this same period, an individual by the name of "Tariq" contacted Saric about potentially purchasing Tip Top. Id. at ¶ 11. Saric had some preliminary conversations with "Tariq" but, in early September 1994, Saric was contacted by a security agent of American Airlines who indicated that "Tariq" was under investigation for possible misuse of airline instruments such as tickets, plates and credit cards. Id. The American Airlines security agent asked Saric if he would be willing to speak with the authorities regarding any discussions with "Tariq." Id. Saric agreed to do so. Id.

On September 26, 1994, Saric met with Special Agent Robert Fortner of the United States Secret Service ("USSS") and others in New York City with respect to Saric's discussions with "Tariq," id. at ¶ 12, who the authorities believed was conducting a "bust out" scheme in which he would process the sales of airline tickets and fail to remit the proceeds to ARC. Transcript of Oct. 20, 2010 Hearing ("Tr. 10/20/10") at 5-6. Once Saric arrived at the USSS office, Agent Fortner requested that he leave and return with Tip Top's business documents. Id. at 8. Saric complied, left the office and returned soon after with Tip Top's documents. Id. at 9.

3

When Saric returned, the documents were submitted to an ARC representative so that an audit could be conducted. Id. The audit indicated that there was approximately $188,000 which Tip Top had not remitted to ARC. Id. at 10. At this time, Agent Fortner concluded that Saric himself was conducting a "bust out" scheme, id., and according to Saric, Agent Fortner then placed him under arrest. (Def. Aff. at ¶ 14). Saric claims that Agent Fortner failed to read him his rights pursuant to Miranda during any conversation either before or after his arrest. Id. Saric also denies having made any incriminating statements during this conversation. Id. at ¶ 15.

Contrary to Saric's affidavit, Agent Fortner testified at the October 20, 2010 suppression hearing that Saric was not placed under arrest during this meeting on September 26, 1994. (Tr. 10/20/10 at 10). Rather, Agent Fortner testified, that once the audit was complete, he "confronted" Saric with the results. Id. at 19. According to Agent Fortner, Saric said he did not have the money for the sale of the tickets and that he could not explain what happened to the money. Id. Before further questioning, Agent Fortner then read Saric his Miranda rights and Saric agreed to continue the conversation. Id. at 20. At this point, Saric again told Agent Fortner that he was aware of the fact that he was no longer authorized by ARC to issue tickets. Id. at 12-13. The remainder of the interview lasted less than an hour. Id. at 13. After the interview, Saric left the USSS offices. Two days later, on September 28, 1994, Saric was arrested by Agent Fortner pursuant to a judicially authorized arrest warrant. Id. at 14.

Saric was charged in this District on or about September 27, 1994 with access device fraud in violation of 18 U.S.C. §1029, and a warrant was issued for the Defendant's arrest. The Defendant was arrested on September 28, 1994 (Trilling Aff. ¶¶ 3-4). On the same day as his arrest, Saric was processed and arraigned before a magistrate in this District on a sealed complaint. Id. at ¶ 4. The magistrate judge released Saric on a $200,000 personal recognizance

4

bond after setting bail conditions including the posting of a cash bond, the surrender of Saric's passport by the following day, September 29, 1994 by 5:00pm, and the surrender of all blank airline ticket stock. Id.

According to Saric, he returned to the magistrate clerk's office and surrendered his Canadian passport and citizenship documents on the same day as his presentment. (Def. Aff. ¶ 16). A review of court documents and transcripts, however, indicates that the Defendant failed to appear in Court to surrender his passport or post the cash bond, or to inform the Court that he was unable to comply with the conditions within the time frame required by the Court. (Trilling Aff. ¶ 6). Upon Saric's release, he contacted Mark Edelstein, the consultant who was going to help Saric find investors for Tip Top, seeking a recommendation for a criminal attorney to assist him on this matter. (Def. Aff. ¶17). Edelstein recommended an attorney by the name of Jack Solerwitz. Id. Saric states that he met with Solerwitz on the date of his release, September 28, 1994, at Solerwitz's office at 1 Delancy Street. Id. at ¶ 18. According to Saric, he paid Solerwitz a retainer at that time and Solerwitz told Saric that he would go to court the following day to review Saric's file and investigate the case. Id. The following evening, on September 29, 1994, Saric claims he met Solerwitz again at the Delancy Street law office. Id. at ¶ 19. At that time, Saric states, Solerwitz handed him his passport and Canadian citizenship card and told him that a mistake had been made and that the criminal case against Saric had been dismissed. Id.

The Defendant failed to appear in magistrate court on September 29, 1994 and a violation of bail hearing was held on September 30, 1994.[1] (Trilling Aff. ¶¶ 6, 8). On September 30, 1994,

---

[1] It should be noted that Andrew Schapiro of the Federal Defenders Services Unit, Legal Aid Society, represented Saric both at his presentment on September 28, 1994 and, due to Saric's failure to surrender his passport on September 29, 1994, at his violation of bail hearing held on September 30, 1994. (Trilling Aff. ¶¶ 4,6). At no point did Schapiro state that Solerwitz, or any other attorney, had been hired to represent Saric, and no other attorney filed a notice of appearance in this case until 2010 when the Defendant was presented before this Court. Id. at 9.

United States Marshal Service ("USMS") went to Saric's home and place of business, but could not locate him. Id. at ¶ 7. The USMS spoke with the superintendent at the apartment building where the Defendant was last known to reside and learned that the Defendant had left his residence early on the morning of September 30, 1994. Id. Based on this information, the USMS made an inquiry at the local airports and learned that Saric had taken a flight at approximately 5:00 am on the morning of September 30, 1994 from LaGuardia Airport to Montreal, Canada. Id.

On July 20, 1995, a grand jury sitting in this District returned a two-count indictment against Saric, charging him with one count of access device fraud in violation of 18 U.S.C. § 1029, and one count of bail jumping, in violation of 18 U.S.C. §3146. Id. at ¶ 11. On July 25, 1995, an arrest warrant was issued based on the Indictment Id.

In March 1996, United States Postal Inspector John Marsh, through contacts with Canadian banks and authorities learned of an address where the Defendant was believed to be receiving mail. Id. at ¶ 12. This address was 4854 Cotec Des Nieges, Apartment 1210, Montreal, Quebec H37 1G7 ("First Address"). Id. By in or about September 1996, Postal Inspector Marsh confirmed through the Royal Canadian Mounted Police ("RCMP") that the Defendant was indeed receiving mail at the First Address and that his name was listed on the lobby directory of that residence. Id.

By September 25, 1996, an extradition package was finalized and forwarded to the Canadian authorities by the Department of Justice's Office of International Affairs ("OIA"). Id. at ¶ 13. On or about November 25, 1996, the Canadian authorities notified OIA that the submitted package was incomplete and, among other things, did not meet the country's requirement of containing affidavits from persons with first-hand knowledge. Id. Two years later, in about September 23, 1998, a revised extradition package was submitted to Canada. Id.

at ¶ 15. While Canada accepted this revised request, Canadian authorities soon informed OIA and the U.S. Attorney's Office that they could no longer locate the Defendant. Id. On or about June 14, 1999, the RCMP notified the USSS that Canadian law enforcement officers had visited the last known address of the Defendant in or about December 1998 and discovered that he had vacated that address in or about 1997. Id. Canadian authorities continued their attempt to locate the Defendant, but in or about November 2001, Canadian authorities again notified OIA that they could not confirm whether the Defendant was within the province of Quebec. Id. at ¶ 16. In or about November 2002, the U.S. Attorney's Office and OIA jointly decided to close their files on the 1998 extradition request to Canada in light of Canada's inability to locate the Defendant. Id.

During the period between 1998 and 2007, the USSS and USMS conducted checks of various law enforcement databases including the New York State Department of Motor Vehicles ("DMV"), New York Statewide Police Information Network ("NYSPIN"), National Crime Information Center ("NCIC"), Autotrack, and Treasury Enforcement Communications Systems ("TECS") in an attempt to locate the Defendant. Id. at ¶ 17-26. These checks were all unsuccessful. Id. In or about March 2007, a Deputy United States Marshal ("DUSM") learned from a contact at the Bank of Nova Scotia in Toronto, Canada, that the Defendant had an active bank account with that Bank. Id. at ¶ 27. The DUSM also learned from the bank that the Defendant had a current listed address of 3651 Av De L'Hotel De Ville, Montreal, Canada ("Second Address"). Id. The DUSM also located an article submitted by the Defendant to a local Free Mason's chapter in Montreal. Id. The DUSM notified the U.S. Attorney's Office of his findings and that office, along with the OIA, worked together to prepare and submit a new extradition package to Canada. Id. Approximately five months later, in or about August 2007, OIA forwarded the new extradition request to Canada and on July 22, 2008, Saric was arrested in

7

Canada. Id. at ¶¶ 28-29. An extradition hearing was scheduled for September 16, 2008 but was postponed, at Saric's request, to November 20, 2008. Id. at ¶ 29. The extradition hearing was held on November 20, 2008, and the Defendant was ordered extradited. Id. Saric appealed the extradition order, but this appeal was heard and dismissed on June 11, 2010. Id. The Defendant was then ordered to surrender to the Canadian prison authorities within 24 hours of the dismissal of his appeal. Id. at ¶ 30. Instead, the Defendant sent an email on June 11, 2010 to an agent with Immigration and Customs Enforcement ("ICE") based in Buffalo, New York, stating his intent to turn himself in. Id.

On or about June 12, 2010, the Defendant presented himself at the New York-Canada border at the Champlain, New York port of entry and told the border patrol agent that he was present for a meeting with the United States Marshals and that there was a warrant for his arrest. Id. at ¶ 31. The Defendant was fingerprinted and two outstanding warrants were returned. Id. The Defendant was taken into custody and after being presented before a magistrate judge in the Northern District of New York, he was transferred to this District. Id. at ¶ 32. The Defendant was presented in this District and arraigned before this Court on June 21, 2010. Id.

## III.  Legal Discussion

### A.  Motion to Dismiss the Indictment Pursuant to the Sixth Amendment and Speedy Trial Act.

Saric moves to dismiss the Indictment in this case on the ground that his right to a speedy trial, as guaranteed both by the Sixth Amendment and the Speedy Trial Act, has been violated. For the following reasons, this argument fails on both grounds.

#### 1.  Sixth Amendment Claim

8

Saric moves to dismiss the Indictment on the ground that the thirteen year delay between his indictment in 1995 and his arrest in 2008 violates his Sixth Amendment right to a speedy trial. This claim is analyzed under the four-factor balancing test set forth in <u>Barker v. Wingo</u>, 407 U.S. 514 (1972). In <u>Barker</u>, the Supreme Court identified four factors to be considered in determining whether a Defendant's Sixth Amendment right to a speedy trial has been violated: 1) the length of delay between the Defendant's indictment and trial; 2) the reason for the delay; 3) when the Defendant asserted the right; and 4) whether the Defendant has suffered prejudice due to the delay. <u>Id.</u> at 530. No one of these factors is "either a necessary or sufficient condition to the finding of a deprivation of the right." <u>Id.</u> at 533. Rather, Courts engage in a balancing process whereby the conduct of both the prosecution and the Defendant are weighed. <u>Id.</u>

### a. Length of Delay

The first factor of the <u>Barker</u> test considers the length of the pretrial delay. This factor is "to some extent a triggering mechanism" such that a Defendant must allege that the interval has crossed the threshold dividing ordinary from "presumptively prejudicial" delay in order for the other factors to be considered. <u>Id.</u> at 530. Here approximately thirteen years have elapsed between the date of Saric's indictment, July 20, 1995, and the date of his arrest in Montreal, Canada, July 22, 2008. Both parties agree that the thirteen year delay is sufficient to trigger the analysis of the remaining <u>Barker</u> factors. (Def. Memo 5, Gov. Opp. 11).

### b. Reason for the Delay

The second <u>Barker</u> factor requires the Court to determine the responsibility of each party in contributing to this delay. <u>Barker</u>, 407 U.S. at 530. Here, the Supreme Court emphasized, that neutral reasons for a delay, such as negligence on the part of the prosecution or overcrowded courts, should be weighed less heavily that any deliberate attempt to delay the trial. <u>Id.</u> at 531.

These neutral reasons should nevertheless be considered, however, because the "ultimate responsibility for such circumstances must rest with the government." Id. at 531.

The facts in this case indicate that Saric's flight from the United States, coupled with negligence on the part of the Government in attempting to locate and apprehend the defendant, led to the extremely long delay between Saric's indictment and eventual arrest. Saric, however, is primarily to blame for this delay because, as discussed below, his flight from the United States was a deliberate act intended to delay his own apprehension and prosecution. Consequently, the balance of this factor tips towards the Government.

Defendant's Flight

Saric states two motivations for his flight to Canada on the morning of September 30, 1994 – not even forty-eight hours after his arrest: 1) that his attorney, Jack Solerwitz, told him on the evening of September 29, 1994 that there had been a mistake at the court and that the pending criminal case against him had been dismissed (Def. Aff. ¶¶ 19, 22); and 2) that the B-1 visa which enabled Saric to live lawfully in the United States was dependent on his employment with Tip Top – an enterprise which was no longer viable. Id. at ¶ 20.

With respect to the first motivation, the Government has provided significant information indicating that the Defendant's version of events surrounding his meeting with Solerwitz is implausible. Significantly, prior records indicate that Solerwitz (who is now deceased) was serving a five to fifteen year sentence at Queensboro Correctional Facility in Queens, New York in 1994, such that he could not have met with Saric at any time between September 28, 1994, when Saric was arrested and subsequently retained Solerwitz, and September 30, 1994, when Saric left the United States for Canada. (Gov. Opp. Memo 13-14). In response, the reply affidavit submitted on behalf of the Defendant highlighted the fact that Queensboro Correctional Facility

10

was a work release facility in 1994, and submitted that Saric's stated account that he met with

Solerwitz during this period was plausible because Solerwitz could have met with Saric while

out on work release. (Reply Aff. ¶¶ 5-8).

 The Government concedes that the Queensboro Facility was a work release facility in

1994. (Gov. Post Hearing Memo at 4-5). It also asserts, however, that on or about September 23,

1994, Solerwitz was released or furlough, or temporary leave of absence from a prison term, out

of the Queensboro Facility. (Braccini Aff. ¶ 3). On or about September 28, 1994, the day of

Saric's arrest, Solewitz's furlough ended, at which point he returned to the Queensboro Facility

at an unknown time. Id. Solerwitz remained at the Queensboro facility until on or about

September 30, 1994, the day the Defendant left the country, at which point, he was again

released on furlough out of the facility at an unknown time on that date. Id. During the period of

time that Solerwitz was checked into the Queensboro facility (from September 28, 1994 to

September 30, 1994) he would not have been allowed out of the facility and would not have been

allowed to have any visitors at the facility. Id.

 In light of Solerwitz's status as confined in the Queensboro Correctional Facility during

the period in which Saric claims to have met with him, the Defendant's first justification for his

flight to Canada appears highly implausible. Saric claims that he met with Solerwitz twice: first,

on the day of his arrest to pay Solerwitz a retainer; and second, on the day following his arrest

when Solerwitz allegedly told Saric that a mistake had been made and that the pending criminal

case had been dismissed. (Def. Aff. ¶¶ 18-19, 22). While it is physically possible that the

Defendant met with Solerwitz on September 28, 1994, before Solerwitz was required to return to

the facility, the fact that Solerwitz was checked into the Queensboro Facility between September

28, 1994 and September 30, 1994 indicates that Solerwitz could not have met with Saric on

11

September 29, 1994, the date Saric alleges Solerwitz told him his case had been dismissed.[2]

Consequently, Saric's assertion that he fled the United States for Canada because Solerwitz told

him, in person, that the case had been dismissed, simply cannot be true.

While this first rationale has been discredited, Saric does assert a second reason for his

sudden flight to Canada – that he needed to leave the United States because his B-1 visa, which

enabled him to lawfully live in this country, was dependent on his employment at Tip Top and

that agency no longer appeared to be a "viable enterprise." Id. at ¶ 20. However given the fact

that the alleged conversation in which Solerwitz told Saric that his case had been dismissed

could not have occurred as Saric alleges, Saric would have no reason to believe that he was no

longer subject to the bail conditions set on September 28, 1994. Saric had been advised in open

court of the conditions that were set on his release and was advised of the consequences of

failing to comply with his bail conditions. (Trilling Aff. ¶ 5). Saric also signed the "Advice of

Penalties and Sanctions" form acknowledging his understanding of his conditions of release and

the penalties and sanctions accompanying a failure to comply with the conditions of release. Id.

Thus, Saric had no justifiable reason for failing to appear before the magistrate court on

September 29, 1994, and fleeing to Canada the following morning, September 30, 1994. Because

it was impossible for Saric to meet with Solerwitz at the time he alleges and because Saric was

---

[2] Saric further alleges that during this second meeting with Solerwitz on September 29, 1994, Solerwitz returned to him his passport and Canadian citizenship card, which Saric had surrendered to the magistrate clerk's office the day before. (Def. Aff. ¶ 16, 19). Saric claims that he has "no idea" how Solerwitz was able to return these documents to him but that the fact that Solerwitz did return them lent credibility to Solerwitz's claim that the case against Saric had been dismissed. Id. at ¶ 22 n.2. A review of court documents and transcripts indicates, however, that contrary to Saric's claims, he never surrendered these documents to the court. (Trilling Aff. ¶ 6). Consequently, this Court cannot infer, as Saric suggests, that Solerwitz obtained these documents from the magistrate clerk's office. Saric's allegation that Solerwtiz returned these documents to him on the evening of September 29, 1994 is thus also highly implausible.

on notice of his obligations regarding his release on bail, this second rationale also fails to justify Saric's flight from the United States.

Ultimately, with the implausibility of the two explanations provided by the Defendant, we are left with the explanation proffered by the Government – namely, that Saric fled the United States for Canada in an attempt to flee apprehension and prosecution. (Gov. Opp. at 14).

Government Negligence

While Saric's sudden flight to Canada indicates an attempt to flee from prosecution, this does not undermine the fact that Government negligence was also a contributing factor to the thirteen year delay in Saric's apprehension. As the Supreme Court stated in Smith v. Hooey, 393 U.S. 374, 383 (1969), the Government has a "constitutional duty to make a diligent good faith effort" to bring a Defendant to trial promptly. This duty includes an obligation to "exercise due diligence in attempting to locate and apprehend the accused, even if he is a fugitive who is fleeing prosecution." Rayborn v. Scully, 858 F.2d 84, 90 (2d Cir. 1988). Thus, even though the implausibility of Saric's two justifications for his hasty escape suggest that he fled for the purpose of hindering his apprehension, an inquiry must still be made into whether the Government exercised due diligence in attempting to locate and apprehend him.

In this instance, the Government did not file its first extradition request with Canada until more than a year after Saric was indicted. (Trilling Aff. ¶13). Even given this time, this first extradition request was incomplete. Id. It then took the Government two additional years, until September 1998, to submit a revised extradition package containing the required supplemental material. Id. at ¶ 15. By the time the corrected extradition package was finally accepted by Canada in 1998, four years after Saric's flight from the United States, the Canadian authorities could no longer locate the Defendant because he had moved from his First Address in Montreal

13

approximately one year earlier. Id.  From 1998 until 2002, the Canadian authorities continued their efforts to locate the Defendant, without success. Id. at ¶ 16. In 2002, the U.S. Attorney's Office and OIA jointly decided to close their file on the extradition request. Id. During that four year period, the USSS had conducted record checks once in 1998, once in 2000, and twice in 2002. Id. at ¶¶ 17-20. From 2003 until 2006, DUSM, USSS and ISD continued to conduct searches of various databases and records. Id. at ¶¶ 21-26. Finally, in or about March 2007, DUSM Scott Batori located a potential address for the Defendant in Montreal and the U.S. Attorney's Office prepared a new extradition request to submit to Canada. Id. at ¶ 27. On or about July 2008, the Defendant was arrested in Montreal, Canada pursuant to the most recent extradition request. Id. at ¶ 29.

As a threshold matter, it should be noted that while the Government has an obligation to exercise due diligence in attempting to locate and apprehend a Defendant, a state "is perfectly entitled to rely in good faith upon the efforts of another jurisdiction when a suspect…evades arrest in the first state and absconds to that other jurisdiction." Rayborn, 858 F.2d at 91. Such a reliance is permitted however, if the first state is "reasonable and grounded in the belief that the helping jurisdiction is in fact conducting a proper investigation." Id.

According to Saric, upon his return to Canada, he began working as a business consultant specializing in strategic planning and logistics for emerging companies. (Def. Aff. ¶ 21). Saric claims he registered those companies under his own name and filed the necessary tax returns using the same social insurance number he has had since becoming a Canadian citizen. Id. Those tax records also reflect that Saric lived at his Second Address from 2000 up to the time of his arrest in Montreal in 2008. Id. at ¶ 22. Saric states that during the thirteen years between his indictment and his re-arrest, he lived openly in Canada, filed all necessary income tax returns,

14

used credit and bank cards, and even travelled outside of Canada on a number of occasions. Id. at ¶ 25. On each of those occasions of travel, Saric claims to have used his own passport or citizenship card, in his own name with his own identifying numbers, and furthermore asserts that he was never stopped or questioned while traveling. Id.

Given the facts asserted by Saric in his affidavit, it seems likely that a diligent search by the Canadian authorities would have resulted in the apprehension of Saric much earlier than 2008. Nonetheless, the Government was entitled to rely in good faith on the efforts of Canada in attempting to locate and apprehend Saric. The actions of the U.S. Attorney's Office during this thirteen year period, however, suggests that Government negligence also played a role in delaying Saric's apprehension. The U.S. Attorney's Office engaged in hardly any investigative work surrounding Saric's whereabouts between 1998, when the second extradition request was accepted, and 2002, when that office and the OIA decided to jointly close their file on this matter. The supporting affidavit submitted by the Government discusses only four instances where databases were checked for information regarding Saric during that four year period. (Trilling Aff. ¶¶17-20). The Government also waited over a year after the Defendant fled the country to submit an incomplete extradition request, and an additional two years before submitting a modified request.

Thus, with respect to this second Barker factor, it appears that both parties are responsible for the significant delay resulting in Saric's apprehension in 2008, thirteen years after his indictment. While these facts show that the government was not diligent in attempting to locate and apprehend Saric during portions of this period, "negligent delays… should be weighed less heavily against the government than deliberate delays intended to hinder the defense." Rayborn, 858 F.2d at 91. It is clear that Saric's 5:00 am flight from the United States, less than forty-eight

hours after his arrest and presentment before a magistrate on September 28, 1994, indicates a flight from prosecution. This Court "need not ignore a defendant's fugitivity in considering whether there has been a violation of his sixth amendment right to a speedy trial." Rayborn, 858 F.2d at 90. Because Saric's flight cannot be justified by his stated explanations and because the Government was merely negligent, rather than deliberate, in delaying Saric's apprehension, the balance of this factor tips towards the side of the Government.

### c.  When the Defendant Asserted His Right

The third factor of the Barker test considers whether the Defendant asserted his right to a speedy trial in a timely fashion. Barker, 407 U.S. at 530. Saric first asserted his right to speedy trial in 2010, after being arrested in Canada on the extradition request, being ordered extradited at the extradition hearing, appealing that decision and having that appeal dismissed. (Gov. Opp. Memo 18). Saric's failure to assert this right in a timely fashion weighs against him.

Saric was aware when he fled the United States on September 30, 1994, that he was doing so in violation of the conditions set on his bail. As the Supreme Court held in Doggett v. United States, 505 U.S. 647, 653 (1992), were it true that the Defendant knew of his indictment years before his arrest "Barker's third factor…would be weighed heavily against [the Defendant]." Here, it is not clear that Saric knew he was indicted in 1995, but it is clear that he knew about the charges pending against him when he fled the country in 1994. Thus, in cases such as this one, when it is manifestly apparent that a Defendant has "no serious interest in the speedy prosecution of the charges against him, a court need not ignore the Defendant's fugitivity…in determining whether his sixth amendment rights have been violated." Rayborn, 858 F.2d at 92. Ultimately, it is apparent from the facts discussed that Saric had no serious

interest in his own speedy prosecution, and consequently, only asserted this right fifteen years after his Indictment. Thus, this third factor also tips in favor of the Government.

### d.  Prejudice to the Defendant

Finally, the fourth factor in the <u>Barker</u> analysis considers whether there is any prejudice to the Defendant resulting from elapsed time. <u>Barker</u>, 407 U.S. at 530. Although a "showing of prejudice is not a prerequisite" to finding a Sixth Amendment violation, courts have generally "been reluctant to find a speedy trial violation in the absence of genuine prejudice." <u>Rayborn</u>, 858 F.2d at 94.

In <u>Barker</u>, the Supreme Court identified three interests protected by the speedy trial right: 1) to prevent oppressive pretrial incarceration; 2) to minimize anxiety and concern of the accused; and 3) to limit the possibility that the defense will be impaired. <u>Barker</u>, 407 U.S. at 532. Saric was not incarcerated prior to June 2010, and does not argue that the first interest is implicated here. In addition, he also does not claim anxiety or concern during this period. Rather, Saric claims that the implicated interest falls under the third category. Specifically, Saric claims that his ability to present a defense at trial is prejudiced because his memory, as well as the memory of former Tip Top employees, has naturally faded over the years. In addition, he claims that unspecified documents related to Tip Top that are pertinent to his defense have been lost in the fourteen years since the investigation into his company began. (Def. Br. 11).

It is true that Saric's claims regarding fading memories and lost documents may present an obstacle to his case at trial. Such prejudice, however, is a direct consequence of Saric's own behavior. He is primarily to blame for the fourteen year delay in his apprehension because he consciously jumped bail and fled this country in 1994. Thus, any such prejudice that the Defendant may face is a direct consequence of the Defendant's own flight from prosecution.

17

This prejudice is self-inflicted and cannot be used to claim a Sixth Amendment violation of the right to speedy trial. Thus, this fourth factor also tips in favor of the Government.

In conclusion, while the thirteen year delay between Saric's indictment and arrest falls into the category of "preemptively prejudicial delay," an analysis of the remaining three <u>Barker</u> factors tip the scales in favor of the Government and away from the Defendant's claim that this case is violative of his right to a speedy trial under the Sixth Amendment.

For the above reasons, the motion to dismiss on Sixth Amendment Grounds is denied.

### 2.  Speedy Trial Act Claim

In addition to his claim under the Sixth Amendment, Saric also argues that the Indictment should be dismissed as violative of his right to a speedy trial pursuant the Speedy Trial Act, 18 U.S.C. §3161.

18 U.S.C. §3161(b), provides, in relevant part, that:

> [a]ny information or indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested or served with a summons in connection with such charges.

Additionally, 18 U.S.C. § 3161(c)(1) states that the trial of a charge:

> shall commence within seventy days from the filing date (and making public) of the information or indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs.

Periods of delay that are excluded from this computation of time include any period of time resulting from the "absence" or "unavailability" of the Defendant. 18 U.S.C. §3161(3). Section 3161(h)(3)(B) explains that a Defendant shall be considered "absent" when his "whereabouts are unknown and, in addition, he is attempting to avoid apprehension or prosecution or his whereabouts cannot be determined by due diligence." A Defendant shall be

18

considered "unavailable" whenever his "whereabouts are known but his presence for trial cannot be obtained by due diligence or he resists appearing at or being returned for trial." Id.

Saric was absent and/or unavailable within the meaning of 18 U.S.C. § 3161(h)(3) during a majority, if not the entire period between September 29, 1994, when he failed to appear in front of the magistrate court, and June 12, 2010, when he presented himself at the New York-Canada border. During this period, Saric's whereabouts were either unknown and he was attempting to avoid prosecution, or his whereabouts were known but his presence could not be obtained by due diligence. During the period that the Government knew of Saric's whereabouts, the Government fulfilled its obligations by filing extradition requests to the Canadian authorities. At all other times the Defendant's whereabouts were unknown and he was attempting to avoid apprehension by remaining in Canada, knowing that he had absconded from the obligations set forth at his bail hearing on September 28, 1994. Consequently, the Defendant's motion to dismiss on Speedy Trial Act grounds is also denied.

**B. Motion to Dismiss the Indictment for Failure to State an Offense for which Saric can be Prosecuted.**

In addition to his motion to dismiss on speedy trial grounds, Saric also moves to dismiss the Indictment on the grounds that it fails to state an offense for which he can be prosecuted.

In July of 1995, Saric was charged on a two count indictment: count one charged the Defendant with using an unauthorized access device in violation of 18 U.S.C. §1029(a)(2); and count two charged him with jumping bail. (Ind. 1-2). The Defendant seeks to dismiss count one of the Indictment for failure to state an offense for which he can be prosecuted pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B).

A motion to dismiss an indictment must satisfy a high standard. <u>United States v. Kerik</u>, 615 F.Supp.2d 256, 262 (S.D.N.Y. 2009). In order for the indictment to be sufficient, it must give the Defendant notice of the charge against him. Federal Rule of Criminal Procedure 7(c) sets forth the minimal "notice" pleading standard required in federal criminal cases. Under this rule, an indictment must 1) contain a "plain, concise and definite written statement of the essential facts constituting the offense charged" and 2) "give the official or customary citation of the statute … that the Defendant is alleged to have violated." Fed. R.Crim.P. 7(c).

The Second Circuit has held that an indictment is sufficient if it, "first, contains elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." <u>United States v. Alfonso</u>, 143 F.3d 772, 776-77 (2d. Cir. 1998) (<u>citing Hamling v. United States</u>, 418 U.S. 87, 117 (1974)). An indictment "need do little more than track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." <u>United States v. Stavroulakis</u>, 952 F.2d 686, 693 (2d Cir. 1992).

In this case, the Indictment provides the Defendant with sufficient notice of the charges against him, the elements of the offenses, and the manner in which the Defendant is alleged to have committed the offenses. Specifically, the indictment outlines: 1) the requisite intent, here that the actions were conducted "knowingly and with the intent to defraud;" 2) the elements of the offense charged, here that the Defendant, "in an offense affecting interstate commerce, did traffic in and use an unauthorized access device during a one year period, and by such conduct obtained items of value aggregating more than $1,000 during the period" and that the Defendant "used at least 195 unauthorized airline tickets, valued at approximately $188,841.35, which contained a unique Airlines Reporting Corporation travel agency account number and unique

ticket number;" and 3) the venue requirement, here that the Defendant acted "in the Southern District of New York." (Ind. 1). The Indictment cites the pertinent statutes and adequately puts Saric on notice of the charges against him.

In bringing this motion, the Defendant, in essence, argues that because the Government cannot show that Saric was notified that his ACN was revoked or cancelled by the ARC, it is not possible for Saric to have acted "unlawfully, willfully and knowingly" in violation of 1829 U.S.C. §1029(a)(2). (Def. Memo 13-15). This argument is misplaced. The issue of whether or not Saric was notified by the ARC that he was no longer authorized to issue airline tickets is a factual issue that must be determined at trial. The sufficiency of evidence is not appropriately addressed on a pretrial motion to dismiss an indictment. Alfonso, 143 F.3d at 777.

Consequently, because the Indictment meets the standard set forth both by the case law in this Circuit and by Rule 7(c) of the Federal Rules of Criminal Procedure, the Defendant's motion to dismiss the Indictment for failure to state a claim is denied.

### C.  Saric's Motion to Suppress Pre and Post Arrest Statements

Saric also moves for suppression of statements allegedly made during his meeting with Agent Fortner on September 26, 1994. The statements at issue are those in which Saric allegedly told Agent Fortner that he had sold airline tickets after he had been told by the ARC that he was no longer authorized to do so. Saric denies having made any such statement. (Def. Aff. ¶ 15). On October 20, 2010, this Court held a hearing on this issue. Agent Fortner was the only witness called.

According to Agent Fortner, he first met with Saric on or about September 16, 1994. (Tr. 10/20/10 at 16-17). During this initial conversation, Saric told Agent Fortner that people wanted to take over his company, Tip Top, and use it in a "bust out" scheme. Id. at 7. Agent Fortner

testified that a "bust out" scheme is one in which a person processes the sales of airline tickets but fails to turn the payments over to the airline. Id. at 6. At this first meeting, Saric told Agent Fortner that he wanted to assist in the investigation by setting up a reverse sting operation. Id. at 7.

Agent Fortner met with Saric a second time, on September 26, 1994. Id. at 8, 17. Agent Fortner called Saric and asked him to come to the USSS office and Saric complied. Id. at 8. There were also two individuals from ARC present at this meeting. Id. at 7-8. Once Saric arrived, Agent Fortner  asked him to leave and return with the Tip Top's business books and records. Id. at 8-9. Saric complied with this request as well. Id. at 9. When Saric returned with Tip Top's business books and records, Agent Fortner provided them to the ARC representative who conducted an audit. Id. The audit lasted approximately an hour, and Saric stayed in the Secret Service offices during that time. Id.

The ARC audit revealed that approximately 195 airline tickets had been sold between September 16 and September 26, 1994, and that the proceeds from those tickets were approximately $188,000. Id. at 10. After the audit, either Agent Fortner or a representative from ARC "confronted" Saric about the results. Id. at 21-22. At that point, Saric allegedly told Agent Fortner that he did not have the money from the sale of the tickets and could not explain what had happened to those funds. Id. at 19. Then, prior to asking further questions, Agent Fortner testified that he read Saric his rights pursuant to Miranda v. Arizona, 384 U.S. 436 (1966). Id.  at 10. Agent Fortner testified that he read Saric his rights because at that point, once the audits revealed the $188,000 deficiency, he considered Saric to be a "target of the investigation". Id. Agent Fortner did not place Saric under arrest at that point, nor did he place him in handcuffs. Id. While Saric did not sign a waiver of his Miranda rights, Agent Fortner testified that Saric agreed

22

to speak with him. Id. at 20. The remainder of the interview lasted less than an hour. Id. at 13. At

this time Saric allegedly indicated to Agent Fortner, for a second time, that he had issued airline

ticket stock knowing that ARC had revoked the authorization for his company to do so. Id. Agent

Fortner testified that Saric never asked him to stop the interview or to provide him with an

attorney. Id. Likewise, Saric never indicated that he was uncomfortable answering Agent

Fortner's questions. Id. After the interview, Saric left the USSS offices. Id. On September 28,

1994, two days after this interview, Agent Fortner arrested Saric pursuant to a judicially

authorized warrant. Id. at 14. At that time, Agent Fortner testified, Saric was again read his

Miranda rights, but made no additional comments. Id.

    The Defendant asserts that Agent Fortner erred in not reading him his Miranda rights

before he "confronted" Saric with the results of the audit, and consequently, that any

incriminating statements that Saric allegedly made should be suppressed. The Defendant

additionally maintains that he did not validly waive his Miranda rights such that any statements

made after he was allegedly Mirandized should also be suppressed. (Def. Post Hearing Memo 1-

2).

    Under Miranda, the prosecution may not use statements, "whether exculpatory or

inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates use of

procedural safeguards effective to secure the privilege against self incrimination." Miranda, 384

U.S. at 444. Among these safeguards is the Defendant being given his or her Miranda rights.

Miranda, requires all individuals who are under arrest, or "otherwise in police custody, to be

informed, prior to interrogation…of their right to remain silent and to have an attorney present

during questioning." Georgison v. Donelli, 588 F.3d. 145, 155 (2d Cir. 2009).

It is settled law that the protections afforded by <u>Miranda</u> apply only to "custodial interrogations." By "custodial interrogation" the <u>Miranda</u> court meant "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." <u>Miranda</u>, 384 U.S. at 444. Whether an individual is "in custody" is determined by ascertaining whether the individual is "subjected to restraints comparable to those associated with formal arrest." <u>Berkemer v. McCarty</u>, 468 U.S. 420, 441 (1984). This analysis is an objective one which seeks to determine whether a reasonable person in the suspect's position would have understood himself to be subject to "restraints comparable to those associated with formal arrest." <u>Id.</u> Factors to be considered when determining whether a particular setting was "custodial" include: "whether a suspect is or is not told that she is free to leave; the location and atmosphere of the interrogation; the language and tone used by the police; whether the suspect is searched, frisked, or patted down; and the length of the interrogation." <u>Tankleff v. Senkowski</u>, 135 F.3d 235, 244 (2d Cir. 1998)."Interrogation" has been defined by the Supreme Court as "express questioning or its functional equivalent." <u>Rhode Island v. Innis</u>, 446 U.S. 291, 300-01 (1980). Interrogation in the <u>Miranda</u> context "must reflect a measure of compulsion above and beyond that inherent in custody itself." <u>Id.</u> at 300.

Once an individual is subject to "custodial interrogation," no statements, either inculpatory or exculpatory, are admissible against that individual unless they have been advised of, and subsequently waive, their rights pursuant to <u>Miranda.</u> A waiver of <u>Miranda</u> rights must be knowing, intelligent and voluntary. <u>Miranda</u>, 384 U.S. at 444-45. Courts evaluate the validity of a waiver on a totality of the circumstances basis. <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986). The waiver must be "voluntary" in that it is the "product of a free and deliberate choice" and not of "intimidation, coercion or deception." <u>Id.</u> The waiver must also be "knowing and intelligent"

24

in that it must be "made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." Id.

Here, none of the statements Saric allegedly made should be suppressed because the Defendant was not "in custody" and thus, not subject to "custodial interrogation" during his September 26, 1994 interview with Agent Fortner. The Defendant voluntarily came to meet with Agent Fortner at the USSS offices to discuss his conversations with "Tariq" and then voluntary left and returned to the premises with Tip Top business documents. (Tr. 10/20/10 at 8-9). Saric voluntarily stayed in the USSS offices while the audit of his documents were performed and at no point was Saric handcuffed or in any other way restrained or told he was under arrest. Id. Agent Fortner even testified that to the best of his knowledge, he didn't even speak with Saric during the time the audit was being conducted. Id. On these facts, a reasonable person would have felt that they were free to leave. The Defendant was clearly not under "formal arrest" nor was there any restraint upon his freedom.

Upon the completion of the audit Saric was "confronted" with the results of the audit and Saric allegedly responded with incriminating statements. Id. at 19. At this point, before further questioning, Agent Fortner read the Defendant his Miranda rights. Even at this point, once Agent Fortner believed that Saric had become the "target of the investigation," Saric was not under "custodial interrogation" and the act of reading an individual his Miranda rights does not in itself convert a conversation to a custodial interrogation. See United States v. Mason, 660 F.Supp.2d 479 n.12 (W.D.N.Y. 2009) (noting that the fact that Miranda warnings are given to a defendant "is not per se evidence that the defendant is in custody," and that "warnings provided in a non-custodial setting do not convert that setting into a custodial one for Miranda purposes.") Saric

was still not "in custody" at this point, he was free to come and go from the USSS office without restriction and after the interview Saric left the premises on his own.

Saric was taken into custody for the first time two days later on September 28, 1994, when he was arrested by Agent Fortner pursuant to a judicially authorized warrant. (Tr. 10/20/10 at 14). At this time, Saric was entitled to a reading of his Miranda rights, which he received. Id. Saric, however, made no additional statements at this time. Id.

Because Saric was not subject to "custodial interrogation," on September 26, 1994, he was not guaranteed the protections of Miranda, and Agent Fortner's failure to Mirandize the Defendant before "confronting" him regarding the results of the audit was not improper.

Consequently, any statements that Saric allegedly made during this period will not be suppressed on these grounds.

### IV. Conclusion

For the foregoing reasons, Saric's motions to dismiss the Indictment and suppress allegedly incriminating statements are denied.

IT IS SO ORDERED.

Dated:  New York, New York
        January 4, 2011

Robert P. Patterson, Jr.
U.S.D.J.

26

Copies of this order were faxed to:

*Attorney for the Defendant*

**Lori Cohen**
Cohen & Funk, P.C.
145 Hudson Street
Suite 5C
New York, NY 10013
(212)431-1228
Fax: (212) 307-0187

*Attorneys for the Government*

**Michael A. Simons**
Assistant United States Attorney
Mary Jo White, United States Attorney
Criminal Division
One St. Andrew's Plaza
New York, NY 10007
(212) 791-1917
Fax: (212)637-2527

**Michelle Katherine Parikh**
United States Attorney Office, SDNY
One Saint Andrew's Plaza
New York, NY 10007
(212) 637-1071
Fax: (212)637-2527

**Rachel Altfest**
United States Attorney Office, SDNY
One Saint Andrew's Plaza
New York, NY 10007
(212) 637-2460
Fax: (212) 637-2527